1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Jorge Ibarra-Perez,                          No. CV-20-00739-PHX-DWL

10                      Petitioner,

11   v.                                           **ORDER**

12   Chris Howard, et al.,

13                      Respondents.

14

15          Petitioner Jorge Ibarra-Perez (A# 213-351-070), who is detained in the CoreCivic

16   La Palma Correctional Center in Eloy, Arizona, has filed, through counsel, a Petition for

17   Writ of Habeas Corpus under 28 U.S.C. § 2241 ("Petition") (Doc. 1) and an Application

18   for Temporary Restraining Order and Order to Show Cause ("TRO motion") (Doc. 14).

19   The matter is fully briefed and nobody has requested oral argument.  For the following

20   reasons, the Petition and TRO motion will be denied and this action will be terminated.

21                                  **BACKGROUND**

22          Petitioner is a 48-year-old native and citizen of Cuba.  (Doc. 1 ¶ 1.)  In April 2019,

23   believing his life to be in danger, Petitioner flew to Nicaragua and then traveled by car

24   through Honduras, Guatemala, and Mexico.  (*Id.* ¶ 25.)   When he arrived in Mexico, he

25   encountered officials from the Mexican Commission for Refugee Aid and was provided

26   with a temporary Mexican humanitarian visa.  (*Id.* ¶ 27.)

27          On September 14, 2019, Petitioner sought admission to the United States at the

28   DeConcini Port of Entry in Nogales, Arizona, and expressed a fear of persecution or torture

if returned to Cuba.  (*Id.* ¶ 28; Doc. 2-3 at 2; Doc. 2-4 at 74; Doc. 14-2 at 69-77.)  Petitioner was then taken into custody by the United States Department of Homeland Security ("DHS") and issued a Notice to Appear ("NTA") charging him as inadmissible and removable from the United States as an "arriving alien" not in possession of any valid entry documents.  (Doc. 19-4 at 19-21.)

On January 10, 2020, an immigration judge ("IJ") ordered Petitioner removed to Cuba, denied his application for asylum,[1] and granted withholding of removal to Cuba. (Doc. 2-5 at 24-25.)  No alternate country of removal was designated and both parties waived appeal of the IJ's decision.  (*Id.*)

On January 15 or 16, 2020, notwithstanding the absence of any specified alternate country of removal, DHS removed Petitioner to Mexico.  (Doc. 1 ¶ 31; Doc. 2-5 at 33; Doc. 14-2 at 71.)  Petitioner's counsel immediately contacted DHS and was advised by email:

> Mr. Ibarra was indeed granted withholding of removal to Cuba.  However, he does have valid status in Mexico and was accepted by Mexican immigration authorities.  Also noted below, Mr. Ibarra did not raise any claims of fear of returning to Mexico during his immigration proceedings before [the IJ].  As such, there are/were no impediments to executing his lawful removal order by removing him to Mexico.

(Doc. 2-5 at 31.)

On January 17, 2020, Petitioner, accompanied by counsel, sought admission to the United States at the Mariposa Port of Entry in Nogales, Arizona and expressed a fear of persecution or torture if returned to Mexico.  (Doc. 1 ¶ 36; Doc. 2-3 at 2-3; Doc. 14-2 at 71.)  Petitioner was again taken into DHS custody, and on January 21, 2020, he was issued "a new Notice to Appear with the same charges as in previous proceedings."  (Doc. 1 ¶ 37.)

In response, Petitioner filed "a Motion to Reopen [his] prior proceedings to supplement the record with further information as to his fear of return to Mexico and lack

---

[1]     Petitioner was deemed ineligible for asylum under 8 C.F.R. § 1208.13(c)(4) because he did not apply for protection from persecution or torture in at least one country through which he traveled en route to the United States.  (Doc. 1 ¶ 30.)

of permanent legal status in that country." (Doc. 2-5 at 33-34.) Although the motion was initially denied as moot, because DHS had issued a second NTA, the IJ subsequently issued an order granting Petitioner's request to terminate his new removal proceeding and reconsider the denial of his motion to reopen. (Doc. 2-5 at 33-34, 39.) The IJ explained:

> Reopening is appropriate in light of the implicated due process concerns. *See Aden v. Nielsen*, 409 F. Supp.3d 998, 1007-10 (W.D. Wash. 2019) (the Department has the authority to designate a country of removal after proceedings have concluded pursuant to INA§ 241(b) and 8 C.F.R. § 1240.12(d) as well as an affirmative obligation to make a determination regarding an alien's claim of fear before deporting him to such country. The due process clause and the governing statute place the burden on the Department-regardless of whether the country of deportation is designated during or after removal proceedings to provide a meaningful opportunity to be heard on asylum and withholding claims regarding any potential country of removal) [¶] Termination of new proceedings related to the January 21, 2020 charging document is appropriate because reopening of the prior proceedings has been granted to adjudicate Respondent's claim of fear of return to Mexico.

(Doc. 2-5 at 36-39.) Petitioner's 2019 removal proceeding was thereby reopened, and his 2020 removal proceeding was terminated. (*Id.*) In the interim, Petitioner was detained under 8 U.S.C § 1225(b) and placed in the CoreCivic La Palma Correctional Center ("LPCC") in Eloy, Arizona. (Doc. 1 ¶¶ 38-39.)

On February 26, 2020, Petitioner submitted a request to DHS for his release from custody on humanitarian parole; he has yet to receive a response. (Doc. 1 ¶ 38; Doc. 2-3 at 2-5; Doc. 2-5 at 33.) Petitioner then moved for a redetermination of his custody status. Following a hearing on March 23, 2020, an IJ denied Petitioner's request for release on bond, explaining: "No jurisdiction: [Petitioner] is arriving alien." (Doc. 2-6 at 9-10.) The IJ later issued a memorandum of decision that elaborated:

> The Court finds that it lacks jurisdiction to entertain the respondent's request for a change in custody status. [DHS] has classified the respondent as an arriving alien, and the respondent does not contest that classification. The current regulations governing the detention and release of aliens preclude the Court from determining the custody status of arriving aliens in removal proceedings. . . . Insofar as the respondent's request for a custody hearing is based on a constitutional claim regarding the length of his detention, the Court finds that it does not have jurisdiction over such a claim. In *Jennings v. Rodriguez*, the United States Supreme Court held that aliens detained pursuant to INA § 235(b)(1)—such as the respondent—are not entitled to periodic bond hearings before an Immigration Judge. In light of this, and considering that the Court's jurisdiction over this matter is not otherwise conferred by the INA or its implementing regulations, the Court is without jurisdiction over the respondent's instant request. As such, the Court will

deny the respondent's request for a change in custody status.

(Doc. 14-2 at 79-81 [citations omitted].)

## PETITION

In his Petition, Petitioner names LPCC Warden Chris Howard, Acting United States Immigration and Customs Enforcement ("ICE") Phoenix Field Office Director Albert Carter, ICE Phoenix Field Office Assistant Director Cesar Topete, ICE Phoenix Field Office Assistant Director Jason Ciliberti, Acting DHS Secretary Chad Wolf, and United States Attorney General William Barr as Respondents.  (Doc. 1 ¶¶ 11-16.)  Petitioner asserts five grounds for relief.

In Ground One (which is labeled "Wrongful Detention"), Petitioner contends that his detention violates the Due Process Clause of the Fifth Amendment because he has been awarded withholding of removal to Cuba, his final order of removal did not designate an alternate country of removal, and any further review of his grant of withholding of removal is barred by res judicata.  (*Id.* ¶¶ 114-17.)

In Ground Two ("State-Created Danger"), Petitioner contends that his continued detention violates the Due Process Clause of the Fifth Amendment because Respondents have affirmatively placed him in danger by detaining him in conditions that expose him COVID-19 and have acted with deliberate indifference to that known and obvious danger. (*Id.* ¶¶ 118-24.)

In Ground Three ("Special Relationship"), Petitioner contends that his continued detention violates the Due Process Clause of the Fifth Amendment because Respondents, who have a "special relationship" with him that requires them to provide reasonable medical care, have detained him in conditions that place him at a substantial risk of exposure to COVID-19.  (*Id.* ¶¶ 125-35.)

In Ground Four ("Punitive Detention"), Petitioner contends that his continued detention violates the Due Process Clause of the Fifth Amendment because the conditions under which he is detained are worse than the conditions under which criminal detainees are held.  (*Id.* ¶¶ 136-41.)

In Ground Five ("Prolonged Detention"), Petitioner contends that his prolonged detention without a custody redetermination hearing violates the Due Process Clause of the Fifth Amendment.  (*Id.* ¶¶ 142-46.)

As for relief, Petitioner asks the Court to: (1) issue a writ of habeas corpus ordering his immediate release from detention or, in the alternative, issue an injunctive order enjoining Respondents from detaining him; (2) order his release from DHS custody unless Respondents schedule a hearing before an immigration judge where, to continue his detention, the government must establish by clear and convincing evidence that Petitioner presents a risk of flight or danger, taking into account available alternatives to detention; (3) declare that his continued detention violates the Due Process Clause; (4) award reasonable costs and attorney's fees pursuant to the Equal Access to Justice Act; and (5) grant any other relief the Court deems proper.

**DISCUSSION**

I.    COVID-19 Claims (Grounds Two, Three, And Four)

A.    **Factual Background**

1.    COVID-19

COVID-19, a disease caused by a novel strain of coronavirus (SARS-CoV-2), was declared by the World Health Organization as a global pandemic on March 11, 2020.  As of June 22, 2020, nearly 2.3 million individuals had been confirmed positive for COVID-19 in the United States.[2]

The United States Department of Health and Human Services Centers for Disease Control and Prevention ("CDC") reports that individuals who contract and transmit COVID-19 experience symptoms that range from negligible, with some individuals remaining entirely asymptomatic, to mild, such as fever, coughing, and difficulty breathing, to severe, including acute respiratory distress, severe pneumonia, septic shock,

---

[2]    *Coronavirus Resource Center*: *COVID-19 Dashboard*, https://coronavirus.jhu.edu/map.html.

and multi-organ failure, or even death.[3]  The CDC estimates that serious illness or death occurs in 16% of all cases.[4]  Those at high-risk of suffering severe illness or death from COVID-19 include individuals who are 65 years and older and individuals of any age with certain underlying medical conditions, including chronic lung disease, moderate to severe asthma, a serious heart condition, a weakened immune system, severe obesity, diabetes, chronic kidney disease, or liver disease.[5]

The virus that causes COVID-19 is believed to spread mainly through close person-to-person contact via respiratory droplets.[6]  The average incubation period for COVID-19 is 14 days, with a median time of 4-5 days from exposure to onset of symptoms.[7]  The CDC recommends that to avoid exposure and transmission, individuals should maintain a physical distance of at least six feet from others, wear cloth face covers, frequently wash their hands or use hand sanitizer, and disinfect frequently touched surfaces.[8]  High-risk individuals should take additional "special precautions," such as continuing active treatment of underlying medical conditions, obtaining vaccinations against other diseases like influenza and pneumococcal illness, staying home, and remaining away from others "as much as possible."[9]

2.     COVID-19 Guidance for Detention Facilities

On March 23, 2020, the CDC issued an "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities"

---

[3]     *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

[4]     *Situation Summary*, https://www.cdc.gov/coronavirus/2019-ncov/summary.html.

[5]     *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[6]     *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[7]     *See* n.2, *supra*.

[8]     *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[9]     *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

(hereinafter, "CDC Guidance"),[10] which "provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors." The CDC Guidance reports there is a heightened risk of transmission of COVID-19 to and among individuals within detention facilities due to, among other things, the number of sources that can introduce the virus into a facility's population, including detention staff, visitors, contractors, vendors, legal representatives, court staff, and new detainees; the congregated environment in which detainees "live, work, eat, study, and recreate"; and limited medical isolation options, hygiene supplies, and dissemination of accurate information among detainees.[11] For those reasons, the CDC Guidance recommends that detention facilities implement specific measures to prepare for potential transmission of COVID-19, to prevent the spread of COVID-19, and to manage confirmed and suspected COVID-19 cases to prevent further transmission and provide treatment.

The CDC Guidance states that "[a]lthough social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19." It recommends implementing social distancing strategies to increase the physical space between detained persons—which should "ideally [be] 6 feet between all individuals, regardless of the presence of symptoms"—such as increasing space between individuals in cells; increasing space between individuals in lines and waiting areas; choosing recreation spaces where individuals can spread out and staggering time in those spaces; staggering meals and rearranging seating in the dining hall so there is more space between individuals; providing meals inside housing units or cells; and limiting the size of group activities and increasing

---

[10]     *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

[11]     "People in correctional and detention facilities are at greater risk for some illnesses, such as COVID-19." CDC, *FAQs for Correctional and Detention Facilities*, www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html#People.

space between individuals during group activities.  It further recommends that facilities should house quarantined individuals who have had close contact with a COVID-19 case, or individuals in medical isolation who are suspected or confirmed positive with COVID-19, separately in single cells or as a cohort, although "[c]ohorting should only be practiced if there are no other available options."[12]  "If cohorting is unavoidable, [facilities should] make all possible accommodations to reduce exposure risk for the higher-risk individuals."

The CDC Guidance also recommends that facilities implement intensified cleaning and disinfecting procedures and provide education on, and reinforcement of, hygiene practices.  Facilities should, among other things, provide adequate supplies to support intensified cleaning and disinfection practices and "continually restock hygiene supplies throughout the facility."  Facilities should also provide detainees and staff no-cost access to soap, running water, hand drying machines or disposable paper towels, tissues, no-touch trash receptacles, and alcohol-based hand sanitizer with at least 60% alcohol where security restrictions allow.  (*Id.*)  The CDC Guidance underscores that because the virus can be transmitted from contagious yet asymptomatic individuals who are present within the facilities, "[b]oth good hygiene practices and social distancing are critical in preventing further transmission."

On April 10, 2020, the Enforcement and Removal Operations ("ERO") component of DHS/ICE issued a document entitled "COVID-19 Pandemic Response Requirements" (hereinafter, "ICE PRR"),[13] which "builds upon previously issued guidance and sets forth specific mandatory requirements expected to be adopted by all detention facilities housing ICE detainees, as well as best practices for such facilities, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this unprecedented public health crisis."  The ICE PPR states that facilities "must . . . [c]omply

---

[12]   "Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group or quarantining close contacts of a particular case together as a group." (CDC Guidance at 3.)

[13]   *COVID-19 Pandemic Response Requirements*, https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

with the CDC's Interim Guidance."  ICE has also issued "ICE Guidance on COVID-19" along with COVID-19 testing statistics, which it updates daily on its website.[14]

CoreCivic has similarly developed a "CoreCivic Coronavirus (COVID-19) Pandemic Response Plan" (last updated May 7, 2020) and a "Medical Emergency: Pandemic Coronavirus (COVID-19) Plan," which also outline best practices and CDC recommendations.  (Doc. 19-1 at 51-97.)

### 3.   LPCC

LPCC, which is located in Eloy, Arizona, is a privately-run detention facility that contracts with ICE.  (Howard Decl. ¶ 6.)[15]  LPCC houses male detainees and has the capacity to hold 3,240 individuals.  (*Id.* ¶¶ 6, 8.)  As of May 28, 2020, LPCC was operating at 43% capacity, housing approximately 1,399 detainees.  (Supp. Howard Decl. ¶ 8.)[16]

LPCC is composed of three compounds.  Each compound has three buildings (Zuni, Mohave, Hopi, Navajo, Apache, Pima, Yuma, Tewa, and Cocopah).  Each building is divided into three or four housing units (Alpha, Bravo, Charlie, or Delta), also referred to as tanks or pods.  (Howard Decl. ¶ 9.)[17]  Each unit is composed of individual two-person cells that measure approximately 12' by 7' and have a bunk bed, a sink, and a toilet.  (*Id.* ¶ 10.)  Each pod also has a set of communal showers, a dayroom, and an outdoor recreational yard.  (*Id.* ¶ 12.)

According to the "ICE Detainee Statistics" available on ICE's website (last checked June 22, 2020), a total of 87 detainees at LPCC have been confirmed positive for COVID-19 since the beginning of the pandemic, and most of those detainees have since recovered or are no longer detained in the facility.  As of May 28, 2020, there were only 3 detainees at LPCC who were positive for COVID-19.  (Supp. Howard Decl. ¶ 9.)  ICE's website

---

[14]   *ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus.

[15]   Declaration of Warden C. Howard ("Howard Decl.") (May 20, 2020) (Doc. 19-1 at 7-38.)

[16]   Supplemental Declaration of Warden C. Howard ("Supp. Howard Decl.") (Jun. 1, 2020) (Doc. 22-1 at 3-22).

[17]   Petitioner has been housed in LPCC's Hopi Alpha unit since March 10, 2020. (Supp. Howard Decl. ¶ 13.)  As of May 28, 2020, a total of 87 detainees are currently assigned to Hopi Alpha, a capacity of approximately 72.5%. (*Id.*)

states that, as of June 22, 2020, the figure had increased to 17.

4.     COVID-19 Protocols at LPCC

In response to the COVID-19 pandemic, LPCC has developed and implemented a series of protocols informed by CDC Guidance, ICE PRR, and CoreCivic guidance. (Howard Decl. ¶ 20, 29-34, 69.)

a.     *Cohorts and Medical Isolation*

LPCC has implemented protocols for protective cohorts, quarantine cohorts, and medical isolation to limit detainee exposure to COVID-19 and to address infected detainees.     (Howard Decl. ¶ 31.)   If a detainee presents symptoms compatible with COVID-19, such as a fever, cough, body aches, or shortness of breath, the detainee is removed from his housing unit and placed into medical isolation for observation and testing.   The detainee's unit is then placed under quarantine cohort status pending the detainee's test results. (*Id.* ¶¶ 45, 56.)  Detainees in quarantine cohort units will receive all services in-unit and are restricted from moving throughout the facility. (*Id.* ¶ 57.)  If the suspected detainee tests positive, the unit will remain on quarantine cohort status until 14 days have passed with no new reported cases.  (*Id.* ¶ 56.)  LPCC also performs contact tracing analysis for both detainees and staff, using the facility surveillance system to identify other individuals with whom the infected or potentially infected individual came into contact during the preceding 48 hours.  (*Id.* ¶ 75.)

Both suspected-positive and confirmed-positive detainees are medically isolated in a main medical unit, or in one of the two housing units designated for medical isolation, and are housed in single-person cells.  (*Id.* ¶¶ 44, 46-47.)  Detainees who test positive remain in medical isolation for at least 14 days and until medical personnel have determined that the detainee has fully recovered.  (*Id.* ¶¶ 48, 50.) They will be treated by "LPCC medical staff according to existing clinical criteria and with acetaminophen, fluids, and rest, unless a higher level of care requiring hospitalization is indicated." (*Id.* ¶ 54.)

All detainees have access to medical care by filling out a sick call request.  (*Id.* ¶ 58.)  LPCC medical staff collect and triage requests each day and detainees are seen based

on the severity of issues reported.  (*Id.* ¶ 63.)  In units on cohort quarantine status, LPCC medical staff respond to sick call requests and conduct daily rounds to evaluate each detainee for COVID-19 symptoms.  (*Id.* ¶ 58.)

Upon intake, all LPCC detainees, whether newly admitted or returning from outside transport, are screened for COVID-19 when they enter the facility and are placed in medical isolation for 14 days for observation.  (*Id.* ¶¶ 16, 89.)  As of March 31, 2020, all new detainee admissions have been suspended.  (*Id.*)

All LPCC detainees identified by CDC guidelines as having a heightened risk of severe illness if infected with COVID-19 have been placed in protective cohort units in the Apache building to limit their contact with the general population and their potential exposure to COVID-19.  (*Id.* ¶¶ 37-38.)  Petitioner "has never been on this list, or otherwise designated as heightened-risk in accordance with CDC criteria."  (*Id.* ¶ 38.)  Higher-risk detainees are assigned their own cell and receive all food, medical, commissary, recreation, religious, library, and/or legal services in-unit. (*Id.* ¶ 41.)  All staff members are required to wear full PPE (including an N95 mask, goggles, gown/poncho, and gloves) before entering any protective cohort unit. (*Id.* ¶ 42.)  In the event a higher-risk detainee is suspected of having contracted COVID-19, the protective cohort unit will be subject to the quarantine and medical isolation protocols.  (*Id.* ¶ 40.)

b.  *Sanitation and Hygiene*

In LPCC, every unit "has also established frequent deep cleaning processes, where extra disinfection is performed on 'high touch' areas and those areas that could foster the spread of pathogens, including showers, intercoms, door handles, day room surfaces, floors, detainee kiosks, telephones, hand rails, etc."  (*Id.* ¶ 138.)  Dayroom areas and communal restrooms are cleaned and disinfected throughout the day with disinfectant by detainees working in-unit as porters.  (*Id.* ¶ 140.)  When cleaning an area where a confirmed COVID-19 detainee was housed, staff members are required to wear full PPE, including an N95 mask.  (*Id.* ¶ 149.)  All medical areas, equipment, and surfaces are cleaned and disinfected "at least daily" by medical personnel.  (*Id.* ¶¶ 66, 148.)  LPCC staff have

1    assumed responsibility for kitchen, food, and laundry service—detainees are no longer
2    involved in providing these services.  (*Id.* ¶¶ 123, 146.)

3        LPCC provides hygiene products to all detainees at no cost, including a combination
4    shampoo and liquid soap/body wash which can be replenished at any time.  (*Id.* ¶ 131.)
5    Detainees have access to hot water both in their cells and at sinks located in the dayroom.
6    (*Id.* ¶¶ 131-132.)  LPCC detainees are provided with soap and "OSHA-approved HDQ
7    Neutral disinfectant" at no cost to clean and disinfect their cells, immediate living areas,
8    and common area equipment such as tables, telephones, and kiosks before and after
9    personal use. (*Id.* ¶¶ 135-136.)  For security reasons, detainees are not provided with
10   alcohol-based hand sanitizer.  (*Id.* ¶ 133.)

11                    c.    *Masks and Personal Protective Equipment ("PPE")*

12       LPCC provides all detainees with face masks at no cost, and additional masks are
13   provided upon request.  (*Id.* ¶ 99.)  Detainees are instructed to wear masks anytime they
14   are out of their cells, but they are not subject to disciplinary action for failing to do so.  (*Id.*
15   ¶¶ 101-102.)  If a detainee from a cohort quarantine unit is transported outside the unit, that
16   detainee is required to wear a mask and gloves.  (*Id.* ¶¶ 90, 103.)  Before April 27, 2020,
17   the use of masks by LPCC staff in non-medical isolation and protective cohort units "was
18   encouraged, but optional."  (*Id.* ¶ 98.)  As of April 27, 2020, LPCC staff are now "required
19   to wear face masks in the facility at all times, except for when that staff member is eating
20   or when that staff member is in an office alone."  (*Id.*)

21       LPCC staff who enter areas where COVID-19 positive detainees are housed must
22   wear full PPE, including disposable coveralls/gowns, shoe coverings, latex or nitrile
23   gloves, N95 respirator masks, and googles/face shield.  (*Id.* ¶ 51.)  Upon exiting the area,
24   staff must remove their PPE and any contaminated materials at a designated
25   decontamination area.  (*Id.* ¶ 52.)  LPCC staff assigned to cohort quarantine units must
26   wear masks, gloves, clothing covering, and goggles/eye protection.  (*Id.* ¶ 59.)  LPCC staff
27   may wear either single-use ponchos, multiuse ponchos that are sterilized after every use,
28   or disposable jumpsuits.  (*Id.* ¶ 59.)  Attorneys are required to wear PPE if making a legal

1   visit.  (*Id.* ¶ 80.)

2       d. *Visitor and Staff Admission*

3     On March 13, 2020, LPCC suspended social visitation, volunteer entry, and facility

4   audits.  (*Id.* ¶ 70.)  Legal visits remain authorized and attorneys are given the option of

5   conducting in-person legal visits in either a contact setting or non-contact setting.  (*Id.* ¶

6   81.)  All persons entering the facility, including staff, contractors, federal employees,

7   vendors, and attorney visitors, are subject to health screening as a prerequisite to entry.  (*Id.*

8   ¶ 71.)  Those denied entrance must obtain clearance from a medical provider and provide

9   documentation before they will be admitted.  (*Id.* ¶ 74.)

10       e. *Social Distancing*

11     LPCC's total population is at less than 50% of its capacity.  (*Id.* ¶ 114.)  Detainees

12   have space in unit dayroom areas to socially distance from one other and are encouraged

13   to do so.  (*Id.*)  Cell doors remain unlocked at all times and detainees may access their cells

14   at any time to facilitate social distancing.  (*Id.* ¶ 120.)  Detainees are encouraged to sleep

15   head-to-toe.  (*Id.* ¶ 116.)  With the exception of count times, detainees may shower at any

16   time and may choose to shower when no other detainees are in the shower stall.  (*Id.* ¶ 118.)

17     LPCC has implemented satellite feeding practices in all units and detainees receive

18   their meals in-unit rather than in the facility dining hall.  (*Id.* ¶ 119.)  Detainees are provided

19   boxed meals that are handed to each detainee in front of his cell—this practice prevents

20   detainees from standing in lines.  (*Id.* ¶¶ 121-123.)  Detainees are permitted to eat in their

21   cells, at the tables in the dayroom, or any other location in the dayroom area.  (*Id.* ¶ 120.)

22       f. *Education*

23     LPCC detainees are educated on COVID-19 at town hall meetings and through

24   educational materials posted throughout the facility and in housing units.  Detainees are

25   provided with information on COVID-19 symptoms, how to obtain medical services, social

26   distancing, sanitation, hand washing, personal hygiene, exposure prevention practices, and

27   on how to wear, handle, and dispose of masks.  (*Id.* ¶¶ 60, 100, 108, 110, 115, 129.)

28     …

1          B.      **Parties' Contentions**

2          Petitioner argues that, in spite of the heightened risk of transmission of COVID-19

3    in detention facilities, Respondents have failed to implement reasonable recommended

4    policies and practices to abate that risk and, instead, have created conditions that place him

5    at a greater risk of exposure and impede his ability to protect himself from COVID-19.

6    (Doc. 14 at 5-6, 8-9, 12-15.)   In support of these contentions, Petitioner submitted

7    declarations from another LPCC detainee and from three immigration attorneys and legal

8    assistants who represent clients detained at LPCC.[18]   These declarations state that, before

9    Petitioner initiated this action, LPCC staff were not required to wear masks or other PPE

10   around detainees.  (First Acosta Decl. ¶ 12.)  These declarations further state that LPCC

11   detainees were unable to socially distance themselves from others; there were no

12   limitations on the flow of detainees in either living quarters or common areas, and detainees

13   were unable to maintain a six-foot distance from others in their cells, bathrooms, dining

14   halls, or in lines.  (Mahmoud Decl. ¶¶ 9-11; First Ferguson Decl. ¶¶ 7-9.)  Additionally,

15   these declarations state that LPCC detainees were unable to practice safe hygiene;

16   detainees were only provided with limited shampoo or soap to shower, there was no hand

17   sanitizer in the units, and they were not provided with PPE to clean common areas or

18   disinfectant to clean their cells.  (First Acosta Decl. ¶ 15; Mahmoud Decl. ¶ 14; First

19   Ferguson Decl. ¶¶ 7, 9-10.)  Finally, these declarations state that detainees who exhibited

20   symptoms of COVID-19 were not being screened, tested, or isolated, nor were they

21   provided with medical attention.  (First Ferguson Decl. ¶ 5-6.)

22         In response, Respondents argue that (1) Petitioner's COVID-19 claims are not

23   cognizable because they challenge the conditions of his confinement, which cannot be

24   remedied through a writ of habeas corpus; and (2) alternatively, Petitioner's COVID-19

25   claims fail on the merits because Respondents have taken great pains to implement CDC-

26   _____

27   [18]    Declaration of Monika Sud-Devaraj, Esq. (Mar. 27, 2020) ("Sud-Devaraj Decl.")
     (Doc. 2-2 at 101-102); Declaration of Rocío Castañeda Acosta, Esq. (Mar. 26, 2020) ("First
28   Acosta Decl.") (Doc. 2-2 at 104-107); Declaration of Mohamed Mahmoud (Mar. 30, 2020)
     ("Mahmoud Decl.") (Doc. 2-2 at 109-111); Declaration of Yesenia Ramales Ferguson
     (Mar. 30, 2020) ("First Ferguson Decl.") (Doc. 2-2 at 113-114).

recommended policies and practices at LPCC to prevent and mitigate the spread of COVID-19.  (Doc. 19 at 12-24.)

In an effort to refute Respondents' assertions concerning the COVID-19 precautions currently in place at LPCC, Petitioner attached a series of additional declarations to his reply.[19]  These declarations state that Petitioner and other LPCC detainees remain unable to maintain a six-foot distance from others in their cells or when they are in common areas.  (Second Ferguson Decl. ¶¶ 7-9; Third Ferguson Decl. ¶¶ 5-6, 11; Fourth Ferguson Decl. ¶¶ 6-7.)  These declarations also state that detainees lack access to bar soap, effective cleaning products, and hand sanitizer.  (Second Ferguson Decl. ¶¶ 15-16; Third Ferguson Decl. ¶ 14; Fourth Ferguson Decl. ¶ 37; Second Acosta Decl. ¶ 9.)  According to Petitioner's declarants, staff pass from unit to unit without sanitizing their protective outerwear.  (Second Ferguson Decl. ¶ 18; Third Ferguson Decl. ¶ 8; Fourth Ferguson Decl. ¶¶ 12-13; Second Acosta Decl. ¶ 14.)  Petitioner's declarants also state that, although detainees are provided masks, they are not required to wear them and most do not.  (Second Ferguson Decl. ¶ 11; Fourth Ferguson Decl. ¶ 9.)  Finally, Petitioner's declarants state that many detainees refuse to report having COVID-19 symptoms because they do not want to be placed in medical isolation.  (Second Ferguson Decl. ¶ 13.)

C.   **Analysis**

1.   Cognizability

In general, "[h]abeas corpus proceedings are the proper mechanism for a prisoner to challenge the 'legality or duration' of confinement.  A civil rights action, in contrast, is the proper method of challenging 'conditions of . . . confinement.'"  *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) (citation omitted).  *Cf. Muhammad v. Close*, 540 U.S. 749, 750 (2004) ("Federal law opens two main avenues to relief on complaints related to imprisonment: a petition for habeas corpus . . . and a complaint under . . . 42 U.S.C. § 1983.

---

[19]   Declaration of Yesenia Ramales Ferguson (May 26, 2020) ("Second Ferguson Decl.") (Doc. 20-2 at 7-9); Declaration of Yesenia Ramales Ferguson (May 13, 2020) ("Third Ferguson Decl.") (Doc. 20-2 at 11-12); Declaration of Yesenia Ramales Ferguson (May 27, 2020) ("Fourth Ferguson Decl.") (Doc. 20-2 at 14-20); Declaration of Rocío Castañeda Acosta (May 10, 2020) ("Second Acosta Decl.") (Doc. 20-2 at 22-23).

Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus; requests for relief turning on circumstances of confinement may be presented in a § 1983 action.").  Thus, when a federal detainee believes the *fact* of his detention is unconstitutional, he may seek release by filing a habeas corpus petition under 28 U.S.C. § 2241.  *See also Trinidad y Garcia v. Thomas*, 683 F.3d 952, 956 (9th Cir. 2012) ("The writ of habeas corpus historically provides a remedy to non-citizens challenging executive detention.").  In contrast, when a federal detainee wishes to challenge the *conditions* in which he is being detained, the usual vehicle for asserting such a claim is a civil rights action.

Given these principles, there is a strong argument that Counts Two , Three, and Four of the Petition—the counts in which Petitioner asks to be released from custody due to Respondents' alleged failure to implement sufficient safety precautions related to COVID-19 at his detention facility—are not cognizable in this § 2241 action.  At bottom, these claims relate to the conditions in which Petitioner is being held.  Yet even if Petitioner were correct that the challenged conditions violate the Constitution, it doesn't follow that the proper remedy would be to order Petitioner's immediate release from custody.  Instead, the remedy would presumably be to order the detention facility to provide improved conditions (or order Respondents to transfer Petitioner to a different facility with better conditions) and, potentially, to compensate Petitioner for any damages he has suffered as a result of his exposure to the unconstitutional conditions.  *See, e.g., Nettles v. Grounds*, 830 F.3d 922, 933 (9th Cir. 2016) (en banc) ("We have long held that prisoners may not challenge mere conditions of confinement in habeas corpus . . . ."); *Crawford v. Bell*, 599 F.2d 890, 891-92 (9th Cir. 1979) ("According to the traditional interpretation, the writ of habeas corpus is limited to attacks upon the legality or duration of confinement.  Crawford's petition does not challenge the legality of his imprisonment.  Instead, the petition alleges that the terms and conditions of his incarceration constitute cruel and unusual punishment, violate his right to due process, and invade his constitutionally protected privacy.  The appropriate remedy for such constitutional violations, if proven, would be a judicially

1    mandated change in conditions and/or an award of damages, but not release from

2    confinement.").

3         Unfortunately, Ninth Circuit law does not resolve this question definitively.

4    Although the Ninth Circuit has issued a series of unpublished decisions affirming the

5    dismissal of conditions-of-confinement claims asserted by federal detainees via § 2241, on

6    the ground that such claims should have been asserted via a *Bivens* (or other civil rights)

7    claim,[20] the en banc court in *Nettles*—which rejected a state prisoner's attempt to raise a

8    conditions-of-confinement claim via 28 U.S.C. § 2254—declined to resolve whether its

9    holding would apply in a § 2241 proceeding.  830 F.3d at 931 ("Because the case before

10   us involves a state prisoner's action under 28 U.S.C. § 2254, we need not address how the

11   standard . . . adopted here applies to relief sought by prisoners in federal custody.").

12   Similarly, the Supreme Court has left open the possibility that a federal detainee might,

13   under the right set of circumstances, be able to raise a conditions-of-confinement claim

14   under § 2241: "Respondents . . . challenge large-scale policy decisions concerning the

15   conditions of confinement imposed on hundreds of prisoners.  To address those kinds of

16   decisions, detainees may seek injunctive relief.  And in addition to that, we have left open

17   the question whether they might be able to challenge their confinement conditions via a

18   petition for a writ of habeas corpus." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017).

19   And because the door has been left ajar in this fashion, district courts within the Ninth

20   Circuit have reached conflicting decisions concerning whether a federal detainee may

21   invoke COVID-19 as the basis for seeking a release from custody via § a 2241 petition.

22   *Compare Bolden v. Prince*, 2020 WL 2097751, *2 (C.D. Cal. 2020) ("Section 2241 is not

---

[20]    *See, e.g., Shook v. Apker*, 472 Fed. App'x 702, 702-03 (9th Cir. 2012) ("Shook contends the district court erred by treating his claims of inadequate medical care as arising under [*Bivens*] rather than section 2241.  We disagree.  Despite the relief he seeks, Shook's claims concern the conditions of his confinement and are properly brought under *Bivens*."); *Alcala v. Rios*, 434 Fed. App'x 668, 669 (9th Cir. 2011) ("The district court correctly concluded that Alcala's claims are not cognizable under 28 U.S.C. § 2241 because they do not concern the fact or duration of his confinement. . . .  [T]he petition challenges the conditions of confinement and therefore should have been brought as a civil rights action."); *Greenhill v. Lappin*, 376 Fed. App'x 757, 757 (9th Cir. 2010) (affirming dismissal of § 2241 petition because "[t]he appropriate remedy for Greenhill's claim, which relates to the conditions of his confinement, lies in a civil rights action under *Bivens*").

the proper vehicle for Petitioner's claims.") *with Urdaneta v. Keeton*, 2020 WL 2319980, *6 (D. Ariz. 2020) ("[T]hese claims are cognizable under § 2241.").

Were the Court forced to answer the question, it would rule that Counts Two, Three, and Four of the Petition are subject to dismissal because they are not cognizable in a § 2241 action. The appropriate way to address complaints about health care deficiencies in a detention facility is to order the facility (via injunctive relief) to fix the deficiencies, not to compel the facility to release all of its detainees (or the subset of detainees who happened to file § 2241 petitions). *Cf. United States v. Dade*, 959 F.3d 1136, 1139 (9th Cir. 2020) (rejecting federal habeas petitioner's motion for bail, which was premised on the COVID-19 pandemic, and emphasizing that although "[t]his is indeed a special circumstance, and it might warrant a change in the conditions of his confinement (including transfer to another facility) if those risks are not being adequately addressed," the petitioner was instead improperly arguing "he should be released from detention *entirely*"). Nevertheless, resolution of this legal question is ultimately unnecessary here because, as explained below, Counts Two, Three, and Four fail on the merits even assuming they are cognizable.

## 2.   Grounds Two and Three

Although Petitioner's claims in Ground Two ("State-Created Danger") and Ground Three ("Special Relationship") both turn on the alleged shortcomings of Respondents' efforts to protect him from COVID-19, the claims require somewhat different showings. *See generally L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) ("[The] general rule [that] members of the public have no constitutional right to sue state employees who fail to protect them against harm inflicted by third parties . . . is modified by two exceptions: (1) the 'special relationship' exception; and (2) the 'danger creation' exception. Although some cases have blended the two exceptions together, the distinction is important.").

Specifically, to prevail on his state-created danger claim in Ground Two, Petitioner must show that "government employees affirmatively place[d] [him] in a position of danger, that is, where their actions create[d] or expose[d him] to a danger which he . . . would not have otherwise faced. The affirmative act must create an actual, particularized

danger, and the ultimate injury . . . must be foreseeable.  The employees must have also acted with deliberate indifference to a known or obvious danger." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir, 2018) (citations, internal quotation marks, and brackets omitted).[21]  Meanwhile, both parties agree that Petitioner's special relationship claim in Ground Three is governed by *Gordon v. Cty. of Orange*, 888 F.3d 1118 (9th Cir. 2018). (Doc. 14 at 13-14; Doc. 19 at 20.)  Under *Gordon*, the elements of such a claim are that "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." 888 F.3d at 1125.  "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case. . . .  [T]he plaintiff must prove more than negligence but less than subjective intent—something akin to reckless disregard."  *Id.* (citations, internal quotation marks, and brackets omitted).

Petitioner cannot prevail under these standards.  As an initial matter, it's a close call whether Petitioner has demonstrated that Respondents have exposed him to a substantial risk of serious harm to his health and safety.  Petitioner does not claim to have an underlying medical condition that makes him especially susceptible to contracting COVID-19 or places him at a heightened risk for severe illness or death if he were to become

---

[21]     Petitioner's argument that a showing of deliberate indifference isn't required when a civil detainee asserts a state-created danger claim (Doc. 14 at 12) lacks merit.  The case Petitioner cites in support of this claim, *Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004), didn't purport to identify the elements of a state-created danger claim and hasn't been cited in subsequent Ninth Circuit decisions holding that deliberate indifference is required to prevail on such a claim.  *See, e.g., Hernandez*, 897 F.3d at 1133; *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006) ("state actors . . . affirmatively place an individual in danger by acting with deliberate indifference to a known or obvious danger in subjecting the plaintiff to it") (citations, internal quotation marks, and brackets omitted). Instead, *Jones* appears to govern the elements of a punitive detention claim, which is separately addressed in Part I.C.3 *infra*.

infected.  (Doc. 1 ¶ 88 [acknowledging that "Mr. Ibarra-Perez is fortunate not to suffer from any serious chronic health issues"]; Howard Decl. ¶ 38 [Petitioner is not considered high risk under CDC criteria].)  Although it is true that "COVID-19 can quickly cause grave illness to even those in good health" (Doc. 1 ¶ 88), Petitioner has not shown there is a substantial risk that *any* individual who contracts COVID-19—let alone a healthy, 48-year-old like Petitioner—will sustain serious harm.  *Hernandez*, 897 F.3d at 1133 (plaintiff asserting state-created danger claim must show an "actual, particularized danger" that resulted in "foreseeable" injury); *Gordon*, 888 F.3d at 1125 (plaintiff asserting special relationship claim must show that the challenged "conditions put the plaintiff at substantial risk of suffering serious harm").  Nor has Petitioner cited any legal authority to support the proposition that any risk of serious harm is sufficient to support a constitutional claim.  *Cf. Lopez-Marroquin v. Barr*, 955 F.3d 759, 761 (9th Cir. 2020) (Callahan, J., dissenting) ("I also have serious concerns over Lopez's attempt to attack the Executive Branch's handling of COVID-19 at Otay Mesa and other detention facilities.  Lopez is a generic detainee, in that he claims neither to have contracted the virus nor to suffer from any underlying health issues placing him at greater risk than anyone else in Government custody.  Lopez's motion, then, is really just the camel's nose under the tent.  If he's entitled to relief, then who isn't?").

Nevertheless, even assuming the adequacy of Petitioner's showing on this issue, Petitioner has failed to demonstrate that Respondents' efforts to ameliorate the risks posed by COVID-19 at LPCC amount to "deliberate indifference," *Hernandez,* 897 F.3d at 1133, or are "something akin to reckless disregard."  *Gordon*, 888 F.3d at 1125.  As discussed, Respondents have implemented an array of protocols at LPCC designed to mitigate detainee exposure to COVID-19 and manage infections, including reducing the population, suspending visitation and admission of new detainees, and employing measures for screening, testing, isolating detainees with infections, social distancing, hygiene, and distributing masks.  Although Petitioner contends these recent measures remain inadequate, the new practices appear broadly compliant with CDC guidance.  (*See e.g.*,

1    CDC Guidance at 10 [facilities should provide "incarcerated/detained persons and staff no-

2    cost access to . . . liquid soap where possible" and "[p]rovide alcohol-based hand sanitizer

3    . . . where permissible based on security restrictions"]; 11 [facilities should "[i]mplement

4    social distancing strategies to increase the physical space between incarcerated/detained

5    persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)

6    . . . .  Not all strategies will be feasible in all facilities. Example strategies with varying

7    levels of intensity include . . . [a]rrang[ing] bunks so that individuals sleep head to foot to

8    increase the distance between them"].)

9    　　　　Petitioner also contends that Respondents' measures for social distancing and face

10   coverings are deficient in part because Respondents encourage, but do not require, that

11   detainees wear masks or maintain a six-foot distance from one another.  The record,

12   however, fails to establish that Respondents' efforts are so inadequate as to violate due

13   process.  The precautions of mask wearing and social distancing are encouraged of, but not

14   consistently practiced by, the public at large.

15   　　　　Petitioner also points to detainee reports of instances in which staff failed to

16   adequately sanitize units, detainees failed to report COVID-19 symptoms, mixed cleaning

17   solution appeared diluted, and detainees failed to receive certain types of soap.  Although

18   these reports may show that Respondents' implementation of the new protocols has been

19   less than perfect,[22] it does not demonstrate that, when taken together, Respondents' efforts

20   reflect deliberate indifference or reckless disregard for the health and safety of detainees.

21   　　　　The bottom line is that the materials submitted by Respondents convince the Court

22   that officials at LPCC have responded to the COVID-19 pandemic with seriousness and

23   diligence.  Although Petitioner may, understandably, feel that even more should be done,

24   he has not demonstrated that Respondents' efforts are so obviously inadequate as to qualify

25   as deliberate indifference or reckless disregard.

26   　　　　…

27   _____

28   [22]    The Court also notes that some of Petitioner's reports describe the conditions that
were present weeks or months before the new protocols came into place.  (*See, e.g.,* Doc.
2-2 at 109 ¶ 2 ["I entered into [ICE] custody in July of 2018 and left January 13, 2020."].)

1          3.          Ground Four

2          In Ground Four, Petitioner asserts a claim of punitive detention.  The Ninth Circuit

3   has held that where conditions of civil confinement are "identical to, similar to, or more

4   restrictive than, those in which his criminal counterparts are held," those conditions are

5   presumptively punitive.  *Jones,* 393 F.3d at 932.  That presumption is rebuttable and may

6   be overcome if the government demonstrates "legitimate, nonpunitive interests justifying

7   the conditions" and that the restrictions are not "excessive in relation to those interest."  *Id.*

8   at 934-35 (quotation marks omitted).

9          Petitioner contends his detention is punitive because he is "a civil immigration

10  detainee" who is being "subjected to worse conditions than many convicted prisoners."

11  (Doc. 1 ¶ 139.)  Petitioner does not, however, attempt to identify any criminal detention

12  facilities that utilize different (let alone better) COVID-19 protocols than LPCC.  This is

13  the usual method of pursuing a punitive detention claim.  *See, e.g., Torres v. U.S. Dep't of*

14  *Homeland Sec.*, 411 F. Supp. 3d 1036, 1065 (C.D. Cal. 2019) (finding a presumption of

15  punitiveness where plaintiffs "allege[d] conditions at [an ICE detention center] and policies

16  by ICE that are not 'more considerate' than at criminal facilities").  Instead, Petitioner's

17  theory is that, because some criminal defendants have been allowed to delay their reporting

18  date to prison in light of the COVID-19 pandemic and some prisons have allowed criminal

19  detainees to leave the facility and begin serving terms of home confinement during the

20  pandemic, his continued detention shows that he is being subjected to worse—and

21  therefore unconstitutionally punitive—conditions.  (Doc. 14 at 14-15; Doc. 20 at 16-17.)

22         This argument lacks merit.  A claim for punitive detention requires a comparison of

23  the conditions under which civil and criminal detainees "are held."  *Jones*, 393 F.3d at 932,

24  934.  When a criminal defendant receives a delayed reporting date to prison, this does not

25  mean the criminal defendant is being "held" under less restrictive conditions than a civil

26  detainee who was not given the option of delayed reporting.  To hold otherwise would

27  render the word "held" meaningless.  Petitioner has not identified any case endorsing this

28  logic.

1   II.      Detention Claims (Grounds One and Five)

2          Grounds One and Five of the Petition do not concern COVID-19.  Instead, they

3   challenge the constitutionality of Respondents' decision to detain Petitioner during the

4   pendency of his current immigration proceeding.  In Ground One, Petitioner argues that

5   his current term of detention—the one that began on January 17, 2020, when he attempted

6   to reenter the United States after being removed to Mexico—was unconstitutional from its

7   inception.  (Doc. 1 ¶¶ 116 ["Because Mr. Ibarra-Perez has been awarded withholding of

8   removal to Cuba in a final order that does not designate a third country of removal, review

9   of Mr. Ibarra-Perez's grant of withholding of removal is barred by *res judicata* and due

10  process and he is being held at the La Palma Correctional Center in violation of due

11  process."].)  Alternatively, Petitioner argues in Ground Five that, because his detention has

12  now become "prolonged," he is entitled to a bond hearing.

13         A.      **Background Law**

14         It is well established that "U.S. immigration law authorizes the Government to

15  detain certain aliens seeking admission into the country under [8 U.S.C.] §§ 1225(b)(1)

16  and (b)(2)."  *Jennings v. Rodriguez*, 138 S.Ct. 830, 838 (2018).  For example, under 8

17  U.S.C. § 1225(b)(1)(B)(ii), if an arriving alien indicates a fear of persecution or an intention

18  to apply for asylum, and if an asylum officer then determines that the alien has a credible

19  fear of persecution, "the alien *shall be detained* for further consideration of the application

20  for asylum."  *Id.* (emphasis added).  Similarly, under 8 U.S.C. § 1225(b)(2)(A), "if the

21  examining immigration officer determines that an alien seeking admission is not clearly

22  and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding

23  under section 1229a of this title [*i.e.,* a removal proceeding]."  *Id.* (emphasis added).

24         Since 1995, the Ninth Circuit and Supreme Court have issued a series of decisions

25  addressing constitutional challenges brought by aliens detained pursuant to these statutes.

26  It is helpful to examine these decisions in sequential order because they build upon each

27  other.  First, in *Barrera-Echevarria v. Rison*, 44 F.3d 1441 (9th Cir. 1995) (en banc),

28  *superseded by statute as stated in Xi v. INS*, 298 F.3d 832 (9th Cir. 2002), an en banc panel

of the Ninth Circuit considered a constitutional challenge to the prolonged detention of a Cuban national who had been ordered removed but whose removal was not "possible . . . because neither his country of origin, Cuba, nor any third country, will accept him."  *Id.* at 1442.  After holding that the challenger's prolonged detention was statutorily authorized by "the intersection of several statutory provisions," including 8 U.S.C. § 1225(b), *id.* at 1444-48, the court addressed whether his prolonged detention was constitutional.  When conducting this analysis, the court applied "the 'entry fiction,' which provides that '[a]lthough aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country.'"  *Id.* at 1450 (citations omitted).  The court concluded that "[b]ecause excludable aliens are deemed under the entry doctrine not to be present on United States territory, a holding that they have no substantive right to be free from immigration detention reasonably follows."  *Id.*

In *Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ("*Rodriguez II*"), the Ninth Circuit addressed a similar issue.  *Rodriguez II* involved an appeal by the government of a preliminary injunction that had been issued in a class action brought by aliens who sought to challenge, on constitutional grounds, their "prolonged detention, pursuant to certain federal immigration statutes, without individualized bond hearings and determinations to justify their continued detention."  *Id.* at 1130.  As relevant here, one subclass was identified as aliens who had been detained under 8 U.S.C. § 1225(b).  *Id.* at 1130-32.  Relying on *Barrera-Echevarria*, the government argued that the "prolonged detention of 1225(b) subclass members does not implicate constitutional concerns" in light of the "unique constitutional position of arriving aliens," who "enjoy lesser constitutional protections than other detained aliens."  *Id.* at 1139-40.  Notably, when addressing this argument, the *Rodriguez II* court did not quarrel with, and indeed seemed to reaffirm, the proposition that, under *Barrera–Echavarria*, an arriving alien who is subject to the entry fiction does not have a constitutional right to release pending the resolution of a removal

or asylum proceeding. *Id.* at 1141 (holding that post-1995 developments "do[] not undermine *Barrera–Echavarria*'s reasoning as it relates to aliens in the 1225(b) subclass to whom the entry fiction clearly applies (likely the vast majority)"). However, the court noted that the subclass certified by the district court wasn't limited to arriving aliens subject to the entry fiction—it also included some lawful permanent residents ("LPRs") who weren't subject to the entry fiction. *Id.* ("Under current law, § 1225(b) applies to some LPRs returning from abroad who have not been absent for [a] prolonged period . . . ."). Because "the 1225(b) subclass includes at least some aliens who are not subject to the entry fiction doctrine," the *Rodriguez II* court concluded that it was necessary to "apply the canon of constitutional avoidance in construing § 1225(b)." *Id.* at 1443. The court further concluded that the proper way to apply the canon of constitutional avoidance was to construe § 1225(b) as requiring a bond hearing every six months. *Id.* at 1144.

Two years later, in *Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015) ("*Rodriguez III*"), the Ninth Circuit again addressed these issues. In *Rodriguez III*, the government appealed the permanent injunction that had been issued following the remand in *Rodriguez II*. *Id.* at 1130-31. On appeal, the government "argu[ed] that the district court—and we [in *Rodriguez II*]—erred in applying the canon of constitutional avoidance" and that "none of the subclasses are categorically entitled to bond hearings after six months of detention." *Id.* at 1071-72. Notably, when addressing the 1225(b) subclass, the *Rodriguez III* court again suggested that the prolonged detention of aliens subject to the entry fiction was permissible and that its constitutional concerns arose only due to the presence of some LPRs within the subclass: "*[E]ven if the majority of prolonged detentions under § 1225(b) are constitutionally permissible*, . . . Section 1225(b) applies to several categories of lawful permanent residents who are not subject to the entry fiction doctrine . . . . Because those persons are entitled to due process protections under the Fifth Amendment, prolonged detention without bond hearings would raise serious constitutional concerns." *Id.* at 1082 (emphasis added).

Next, in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ("*Rodriguez IV*"), the

Supreme Court reversed *Rodriguez III*, holding (among other things) that the Ninth Circuit's decision to apply the canon of constitutional avoidance to the 1225(b) subclass was mistaken because "[n]othing in the text of § 1225(b)(1) or § 1225(b)(2) even hints that those provisions restrict detention after six months" and "[s]potting a constitutional issue does not give a court the authority to rewrite a statute as it pleases." *Id.* at 843. The Court also rejected the aliens' argument, which had not been raised during the Ninth Circuit proceedings, that §§ 1225(b)(1) and (b)(2) "mandate[] detention only until the start of the applicable proceedings rather than all the way through their conclusion." *Id.* at 844. The Court disagreed, holding that "§§ 1225(b)(1) and (b)(2) mandate detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin." *Id.* at 845. The Court concluded its opinion by declining to resolve, on the merits, whether prolonged detention under § 1225(b) and other statutes would raise constitutional concerns, because the Ninth Circuit hadn't addressed that issue in *Rodriguez III* and "our role [is] as a court of review, not of first view." *Id.* at 851 (citations and internal quotation marks omitted).

Finally, in *Rodriguez v. Marin*, 909 F.3d 252 (9th Cir. 2018) ("*Rodriguez V*"), which was issued following remand by the Supreme Court, the Ninth Circuit likewise "remand[ed] this case to the district court" to consider the merits of the constitutional issue in the first instance. *Id.* at 255-56. Although the *Rodriguez V* court broadly expressed "doubt[] that any statute that allows for arbitrary prolonged detention without any process is constitutional or that those who founded our democracy precisely to protect against the government's arbitrary deprivation of liberty would have thought so," *id.* at 257, it offered no further guidance on how those principles might be applied to arriving aliens detained under § 1225(b) and subject to the entry fiction.

As this summary makes clear, it is permissible under 8 U.S.C. § 1225(b) to detain an arriving alien who has expressed a credible fear of persecution and/or who is subject to removal because he is not clearly entitled to admission. *Rodriguez IV*, 138 S. Ct. at 845. As for how long such detention may last, although the Ninth Circuit suggested in *Rodriguez*

*II* and *Rodriguez III* that prolonged detention under § 1225(b) would raise constitutional concerns when applied to a specific subgroup of arriving aliens—namely, LPRs who previously resided in the United States—it did not question the constitutionality of the prolonged detention of arriving aliens in Petitioner's circumstances.  Instead, it seemed to reaffirm that, under *Barrera-Echevarria*, such detention is constitutionally permissible while an asylum/removal proceeding is pending.  Nor has the Ninth Circuit issued any post-*Rodriguez IV* decisions that overrule those earlier holdings.[23]

> B.    **Analysis**

With this backdrop in mind, Petitioner's claims in Grounds One and Five are easily resolved.  Petitioner's theory in Ground One is that he shouldn't have been detained at all when he returned to the United States following his removal to Mexico—in his view, the initial decision to remove him to Mexico was unlawful and Respondents shouldn't be allowed, based on principles of agency law, *res judicata*, and general fairness, to reopen his removal proceeding so they can belatedly litigate whether removal to Mexico is permissible.  (Doc. 14 at 9-12; Doc. 20 at 9-11.)

Although the Court is sympathetic to Petitioner's circumstances and the ordeal he has encountered, the problem with this argument is that it isn't really an argument about the permissibility of detention.  Instead, it's a backdoor argument concerning the merits of the pending removal proceeding—Petitioner believes he should prevail in that proceeding and is effectively arguing that, because the only reason he's being detained is due to the pendency of that proceeding, this Court should order his immediate release from custody.

---

[23]     In *Padilla v. ICE*, 953 F.3d 1134 (9th Cir. 2020), the Ninth Circuit affirmed "a preliminary injunction ordering the United States to provide bond hearings to a class of noncitizens who were detained *after entering the United States* and were found by an asylum officer to have a credible fear of persecution."  *Id.* at 1138-39 (emphasis added).  Among other things, the court emphasized "the general rule that *once a person is standing on U.S. soil*—regardless of the legality of his or her entry—he or she is entitled to due process."  *Id.* at 1146 (emphasis added).  It also dismissed, as "inapposite," the government's reliance on "cases that address the peculiar constitutional status of noncitizens apprehended at a port-of-entry."  *Id.*  Thus, *Padilla* sheds no light on the question presented here—whether arriving aliens subject to the entry fiction have a constitutional right to periodic bond hearings while their asylum/removal proceedings are pending.

The decision to detain Petitioner on January 17, 2020 was mandated by 8 U.S.C. § 1225(b).  Although Petitioner has identified various reasons why he believes he should ultimately prevail in the proceeding that has ensued, those beliefs do not undermine—let alone cast doubt upon the constitutionality of—the antecedent decision to detain him. Petitioner has not identified any authority allowing habeas relief in these circumstances.[24]

Finally, in Ground Five, Petitioner argues that, because he has now been in continuous custody for about nine months (he argues that, because his removal to Mexico was improper, Respondents shouldn't receive any credit for the short break in custody), he is entitled to bond hearing.  (Doc. 14 at 15-18.)  In response, Respondents argue that "Petitioner has no substantive right to be free from immigration detention or to a bond hearing."  (Doc. 19 at 9-11.)  Respondents acknowledge that the law in this area may change but emphasize that "[t]he Ninth Circuit has not yet articulated a test, post-[*Rodriguez IV*], to determine if and when an arriving alien's detention violates the Constitution."  (*Id.* at 11.)  In reply, Petitioner concedes that Respondents' point about the lack of post-*Rodriguez IV* guidance from the Ninth Circuit "is true as far as it goes" but notes that several district courts have issued recent decisions concluding that aliens in his position are entitled to bond hearings.  (Doc. 20 at 3-9, citing *Banda v. McAleenan*, 385 F. Supp. 3d 1099 (W.D. Wash. 2019)).

Respondents have the better side of this argument.  Although the law in this area may change in the future, the Court must do its best to discern and apply the law of the Ninth Circuit as it currently stands.  As discussed, *Bacerra-Echavarria* suggests it is constitutionally permissible to require Petitioner to remain in custody for the duration of

---

[24]    To the contrary, the case cited in Petitioner's reply—*Bravo-Pedroza v. Gonzales*, 475 F.3d 1358 (9th Cir. 2007)—confirms that the proper way for Petitioner to raise arguments concerning perceived legal errors committed by the IJ during his removal proceeding is to seek review by the Board of Immigration Appeals ("BIA") and then, if necessary, by the Ninth Circuit.  *See generally J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032-33 (9th Cir. 2016) (under 8 U.S.C. §§ 1252(b)(9) and 1252(a)(5), claims that "are not independent or ancillary to the removal proceedings," and are instead "bound up in and an inextricable part of the administrative process," must be exhausted administratively and then presented to the court of appeals).

1   his removal proceeding.  If anything, the Ninth Circuit seemed to ratify that understanding

2   of *Bacerra-Echavarria* in *Rodriguez II* and *Rodriguez III*.   And neither the Supreme

3   Court's decision in *Rodriguez IV* nor the Ninth Circuit's remand order in *Rodriguez V* casts

4   any doubt upon the continued validity of those portions of *Bacerra-Echavarria*, *Rodriguez*

5   *II,* and *Rodriguez III*.  Thus, even accepting for the sake of argument that Petitioner's stint

6   in Mexico doesn't count as a break in custody, Petitioner is not entitled to a bond hearing

7   under current Ninth Circuit law.[25]

8        Finally, it is important to emphasize that this outcome is not an approval of

9   indefinite detention.  The statute under which Petitioner is being detained authorizes his

10  detention only "until specified events take place," *i.e.,* until the resolution of the current

11  removal proceeding.  *Rodriguez IV*, 138 S. Ct. at 850.  And if Petitioner's removal ceases

12  to become reasonably foreseeable, Petitioner will have other potential avenues for seeking

13  release.  *Nadarajah v. Gonzales*, 443 F.3d 1069, 1078 (9th Cir. 2006) (holding that 8 U.S.C.

14  §§ 1225(b)(1)(B)(ii) and (b)(2)(A) "do not authorize the Attorney General to incarcerate

15  detainees for an indefinite period" and that these statutes "permit detention only while

16  removal remains reasonably foreseeable").

17        …

18        …

19        …

20        …

21        …

22

---

[25]     In *Banda*, which is the district court decision on which Petitioner primarily relies,
the court did not cite or discuss *Bacerra-Echavarria,* the "entry fiction," or the portions of
*Rodriguez II* and *Rodriguez III* that seem to adopt *Bacerra-Echavarria*'s logic as it pertains
to arriving aliens who are detained under § 1225(b) and are subject to the entry fiction.
The other district court decisions cited by Petitioner (Doc. 1 ¶ 97) are unhelpful because
they come from outside the Ninth Circuit and do not apply Ninth Circuit precedent.  Nor
are the out-of-Circuit decisions unanimous.  *See, e.g., Poonjani v. Shanahan*, 319 F. Supp.
3d 644, 650 (S.D.N.Y. 2018) ("[B]ecause the statutory language makes clear that aliens
detained pursuant to Section 1225(b)(1)(A) have no statutory entitlement to bond hearings,
and because *Mezei* instructs that, for aliens on the threshold of initial entry, the Constitution
extends no farther than statutory language itself, *Mezei* compels the conclusion that
Petitioner's due process rights have not been infringed [by a lack of bond hearing].").

Accordingly, **IT IS ORDERED** that:

(1)    The Petition (Doc. 1) is **denied**.

(2)    The TRO Motion (Doc. 14) is **denied**.[26]

(3)    The Clerk of Court shall enter judgment accordingly and terminate this action.

Dated this 22nd day of June, 2020.

_____
Dominic W. Lanza
United States District Judge

---

[26]    Because the Court has determined that the Petition fails on the merits, it follows that the TRO motion must be denied.